conspiracy under Count IV, for the improper admission of Imbrieco's plea allocution and Michael's grand jury testimony, as discussed in Part I, supra, and (ii) the convictions under Count VI for the reasons discussed below.

   1. Conspiracy to Obstruct Justice and Obstruction of Justice

"A conspiracy to defraud under [18 U.S.C. § 371] embraces any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." Ballistrea, 101 F.3d at 831 (internal quotation marks omitted). As discussed above, the evidence that the defendants conspired to obstruct justice and obstructed justice was that, shortly after the Shootings, they agreed on a cover story to tell the authorities investigating the Shootings and continued to stick to this cover story even after a federal grand jury was empaneled years later. Section 1503 of Title 18 of the United States Code provides, in relevant part, that it is a crime to "corruptly . . . endeavor[] to influence, obstruct, or impede, the due administration of justice." 18 U.S.C. § 1503(a).

Preliminarily, we note that Polito and Fortunato argue on appeal that the obstruction-of-justice charges should have been dismissed by the District Court because they should have been brought under the federal witness tampering statute, 18 U.S.C. § 1512, instead of the obstruction-of-justice statute, 18 U.S.C. § 1503. In making this argument, the defendants rely on our decision in United States v. Masterpol, 940 F.2d 760 (2d Cir. 1991), where we held that in enacting § 1512 Congress implicitly removed witness tampering from the scope of § 1503. The District Court concluded that the defendants had waived this argument by having failed to raise it in a pretrial motion to dismiss the indictment. On appeal, the Government asks us to affirm the District Court's waiver analysis or, alternatively, to overrule our decision in Masterpol (whose

reasoning has been rejected by every other federal court of appeals that has considered the issue). We decline to reach these arguments, given our conclusion below that the evidence supporting the obstruction-of-justice convictions is legally insufficient.

### a. Conspiracy to Obstruct Justice

To secure a conviction for conspiracy to obstruct justice under § 1503, the Government "must establish (1) that [one] defendant (a) knowingly entered into an agreement with another, (b) with knowledge, or at least anticipation, of a pending judicial proceeding, and (c) with the specific intent to impede that proceeding; and (2) the commission of at least one overt act in furtherance of the conspiracy." Schwarz, 283 F.3d at 105–06. "[A] judicial proceeding need not be pending at the time the conspiracy began so long as the [defendants] had reason to believe one would begin and one in fact did." Id. at 107. Finally, the conduct offered as proof of the intent to obstruct a federal proceeding must, "in the defendant's mind, [have had] the natural and probable effect of obstructing [the proceeding]." Id. at 109 (internal quotation marks omitted).

The leading § 1503 case in this Circuit is Schwarz, which arose out of the infamous, in-custody abuse of Abner Louima by police officers, who were subsequently tried for, among other things, violating § 1503 by lying to federal investigators.[16] There, the evidence showed that, shortly after Louima was assaulted, the police officer-defendants agreed "generally to impede investigators by putting forth and corroborating a false version of what occurred." Id. at 106. During "numerous communications among the [defendants] and others at key points during the

---

[16] Because the defendants were prosecuted for lying to federal investigators instead of federal grand jury witnesses, we had no occasion to address the issue discussed above regarding our conclusion in Masterpol that charges of lying to, or trying to influence, federal grand jury witnesses should be prosecuted under § 1512.

investigations, [the defendants] offered parallel accounts that evolved as other evidence in the case surfaced." Id.

On appeal, we found that there was sufficient evidence to establish that the defendants had generally agreed to impede the investigation and that at least one of them knew about, or anticipated the existence of, a federal grand jury. Id. at 106–07. But we found insufficient evidence that one of the defendants had specifically intended to impede or obstruct the grand jury proceeding. Id. at 109. Although the evidence established that this defendant's memo book had been subpoenaed, it did not establish that he knew that the allegedly false statements he had made to federal investigators would be conveyed to the federal grand jury. As we explained, "[h]e may have hoped that they would be provided to the grand jury, and surely there was that possibility; but there was insufficient evidence to enable a rational trier of fact to conclude that [he] knew that this would happen or that he entertained any expectations on that score that were based on such knowledge." Id. (internal quotation marks omitted). "At best, the [G]overnment proved that [he], knowing of the existence of a federal grand jury investigation, lied to federal investigators regarding issues pertinent to the grand jury's investigation." Id.

Here, whether the defendants knowingly entered into an agreement to impede a potential grand jury proceeding or to obstruct justice is irrelevant, since the evidence is not sufficient to satisfy either the second or the third elements of a conspiracy to obstruct justice. With respect to the second element — knowledge of a grand jury proceeding — the grand jury was not empaneled until some time in 2000, i.e., six years after the Shootings had occurred and the defendants had agreed not to "tell nobody who did nothing." In contrast, the grand jury in Schwarz handed down indictments months after the victim was attacked. Id. at 81. Thus, when

the defendants in this case agreed in 1994 "that [they] [wouldn't] tell nobody who did nothing," they could not reasonably have foreseen a federal grand jury investigation, especially given that the criminal investigation was being conducted by local police and prosecutors — as it would indeed continue to be for several years after the Shootings occurred.[17]

With regard to the third element, specific intent, the jury certainly was entitled to infer from the evidence that, in 2001, both Fortunato and Cersasulo knew about the grand jury when they spoke with their respective relatives. There is little or no evidence, however, that either Fortunato or Cerasulo specifically intended that the statements they made at that time to their respective relatives would eventually be passed along to the grand jury. Cerasulo testified that, shortly after the Shootings in 1994, Cerasulo told Giuseppe that Cerasulo had not been involved in the shooting of Lombardi. Almost seven years later, in October 2001, FBI agents came to Giuseppe's pizzeria and (in Cerasulo's presence) served Giuseppe with a grand jury subpoena and told him that he would be asked questions about Cerasulo's involvement in the Lombardi shooting. In the presence of Giuseppe, the FBI agents then asked Cerasulo about the Lombardi shooting. Cerasulo told them that he had "heard shots . . . [and had run] out." Cerasulo testified that, after 1994, he and Giuseppe "never really talked about" the Lombardi shooting. Moreover, Cerasulo did not testify that he told Giuseppe to lie to the grand jury. Indeed, Cerasulo repeatedly denied ever telling Giuseppe "the truth" about what had happened on the night in

---

[17] Judge Katzmann takes issue with the majority on this point as to the second element, concluding that the modus operandi of individuals involved in organized crime is to assume that anything they say could be used at some point in any variety of legal proceedings, however far down the road.

question.[18] Thus, Cerasulo's statements to Giuseppe, and to the police in Giuseppe's presence, without more, are legally insufficient to support a conviction for conspiracy to obstruct justice under § 1503. See Schwarz, 283 F.3d at 108.

With respect to Michael, the Government also failed to establish that Fortunato specifically intended that the statements he made to Michael would be passed along to the grand jury. First, there was no evidence that, between the time Michael received the grand jury subpoena and the time he testified before the grand jury, Fortunato knew that Michael had received the subpoena. Second, Michael's testimony establishes only that, shortly after he received his grand jury subpoena, he confronted Fortunato about his role in the bank robbery and the Shootings. In response, Fortunato denied any involvement in the robbery and specifically told Michael that he had not seen Lombardi's shooter. And like Cerasulo with Giuseppe, Fortunato never asked Michael to lie to the grand jury. Thus, like Cerasulo's statements to Giuseppe, Fortunato's statements to Michael, standing alone, are legally insufficient to support a conviction under § 1503. See id.

Finally, the Government relies heavily on the excerpts from Imbrieco's improperly admitted plea allocution to prove these obstructions of justice. While Imbrieco's plea allocution may have been probative of whether a conspiracy existed in 1994 to obstruct a grand jury investigation and whether a grand jury investigation was foreseeable in 1994, it sheds no light on whether, in 2001, Cerasulo spoke to Giuseppe with the specific intent of obstructing the federal grand jury investigating the Shootings. Indeed, there is nothing in the plea allocution indicating

---

[18] Giuseppe's grand jury testimony was not introduced at trial.

-35-

that Imbrieco spoke to Cerasulo about any conversations that Cerasulo may have had with Giuseppe.[19]

          b.     Obstruction-of-Justice Counts

The evidence relating to the obstruction of justice was the same evidence that was used to support the convictions for conspiracy to obstruct justice. Thus, the evidence against Fortunato with respect to the obstruction-of-justice count concerning Michael is also legally insufficient. Polito's obstruction-of-justice convictions were premised on a Pinkerton theory of liability, as were Fortunato's and Polito's convictions with respect to the grand jury testimony of Giuseppe. As discussed above, in Pinkerton, 328 U.S. at 646–48, the Supreme Court held that "a defendant who does not directly commit a substantive offense may nevertheless be liable if the commission of the offense by a co-conspirator in furtherance of the conspiracy was reasonably foreseeable to

---

[19] As noted above, Imbrieco's plea allocution only discussed Cerasulo's — and not Fortunato's — attempt to influence a grand jury witness. In Imbrieco's plea allocution, he described an agreement among the defendants in 1994 (as incredible as it seems) to make false statements to the FBI, by answering the following questions in the affirmative:

> [Did] you, Fortunato, Polito, Cerasuolo [sic] or anybody else h[ave] a meeting of the minds, an understanding, that a false statement was going to be made to an FBI agent[?] . . . And also [did] you and one or more of these other people named or anybody else tr[y] to obstruct the due administration of justice[?]
>
> Did you have such an agreement?
>
> . . . .
>
> Is it also true that on or about [November 7, 2001], John Doe [i.e., Giuseppe], who the Grand Jury kn[ew] the identity of, testified before a Grand Jury in this Court[?]
>
> . . . .
>
> [Was there] an effort made to influence the testimony of that Grand Jury?

the defendant as a consequence of their criminal agreement." Cephas v. Nash, 328 F.3d 98, 101 n.3 (2d Cir. 2003). Thus, under Pinkerton, a defendant may be found "guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." United States v. Miley, 513 F.2d 1191, 1208 (2d Cir. 1975).

As discussed above, the evidence that Cerasulo and Fortunato specifically intended to influence the testimony of their respective relatives was legally insufficient with respect to the conspiracy to obstruct justice; thus neither Polito's nor Fortunato's obstruction-of-justice convictions can be sustained under a Pinkerton theory of liability.

    2.    Conspiracy to Make False Statements and Making False Statements

It is a crime to make "any materially false, fictitious, or fraudulent statement[s] or representation[s]" to an FBI agent. 18 U.S.C. § 1001(a)(2); see Ballistrea, 101 F.3d at 834.

    a.    False-Statement Conspiracy

We find that there would be legally sufficient evidence, had all of that evidence been properly admitted, to satisfy the elements of a conspiracy on the part of Polito and Fortunato to make false statements, as alleged in Count IV. First, Imbrieco's plea allocution established the existence of an agreement among the defendants in 1994 to make false statements to the FBI. As alluded to above, although Imbrieco's plea allocution was improperly admitted, we must consider it as having been properly admitted for the purpose of assessing the legal sufficiency of the

evidence to support a criminal conviction.[20] And second, Cerasulo testified that, in 2001, when he was questioned by FBI agents when they served a grand jury subpoena on Giuseppe, Cerasulo denied having been involved in the Shootings. This testimony would be legally sufficient to establish an overt act in furtherance of the false-statement conspiracy. For the reasons set forth above, however, see discussion infra Part I, we vacate the false-statement-conspiracy convictions under Count IV, on the ground that Imbrieco's plea allocution was improperly admitted, and remand for a new trial on these charges.

    b.  <u>False-Statement Counts</u>

Count V charged Polito and Fortunato with making false statements under a <u>Pinkerton</u> theory of liability, for the false statements made by Cerasulo to the FBI in 2001 when he denied having been involved in the Shootings. Here, a rational juror could not have concluded that Polito and Fortunato could have reasonably foreseen when they entered into their false-statement conspiracy in 1994 that Cerasulo, as a natural or necessary consequence of their agreement, would make a false statement to an FBI agent in the course of a federal grand jury investigation that was convened six years later. As we explained in <u>United States v. Jordan</u>, 927 F.2d 53, 56 (2d Cir. 1991), <u>Pinkerton</u> did not create "a broad principle of vicarious liability that imposes

---

[20] See Cruz, 363 F.3d at 197; United States v. Glenn, 312 F.3d 58, 67 (2d Cir. 2002); see also Lockhart v. Nelson, 488 U.S. 33, 39–40 (1988); Burks v. United States, 437 U.S. 1, 17–18 (1978); Greene v. Massey, 437 U.S. 19, 24 (1978). Where, "as here, the evidence is determined to be insufficient when the improperly admitted evidence is excluded from the equation but sufficient when the improperly admitted evidence is included in the equation, the remedy is affected. In such a case, retrial rather than acquittal is the remedy." Cooper v. McGrath, 314 F. Supp. 2d 967, 999 (N.D. Cal. 2004); see Lockhart, 488 U.S. at 39–40; accord Wigglesworth v. Oregon, 49 F.3d 578, 582 (9th Cir. 1995); United States v. Chu Kong Yin, 935 F.2d 990, 1001 (9th Cir. 1991). Cf. United States v. Aarons, 718 F.2d 188, 189 (6th Cir. 1983) (noting that the sufficiency-of-evidence issue "is determinative of whether the appellant may be retried").

criminal responsibility upon every co-conspirator for whatever substantive offenses any of their confederates commit." Accordingly, because Pinkerton liability does not lie with respect to Cerasulo's false statements to the FBI, we reverse the convictions relating to the false-statement offenses charged in Count V.

Finally, with respect to Count VI, the defendants do not challenge the sufficiency of the evidence relating to their liability for Fortunato's false statements to the FBI. Instead, they argue that we should vacate Count VI and remand for a new trial due to the prejudicial spillover from the evidence admitted with respect to the counts that we have reversed on appeal. We agree.

"We look to the totality of the circumstances to assess prejudicial spillover of evidence." United States v. Naimann, 211 F.3d 40, 50 (2d Cir. 2000). "Specifically we examine: 1) whether the evidence on the [reversed] counts was inflammatory and tended to incite or arouse the jury to convict the defendant[s] on the remaining counts; 2) whether the evidence on the [reversed] counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the [G]overnment's case on the remaining counts." Id. Here, we conclude that our reversal of the RICO and VCAR convictions also requires that we vacate Fortunato's false-statement conviction "given the enormous amount of prejudicial spillover evidence admitted to prove the RICO enterprise and its extensive criminal activities." United States v. Tellier, 83 F.3d 578, 581–82 (2d Cir. 1996) (internal quotation marks omitted). Fortunato's false-statement conviction involved a single statement "to which all but a tiny sliver of the evidence admitted on the RICO charges [was] irrelevant." Id. at 582. Thus, it cannot be denied that the spillover

prejudice with respect to Count VI was significant. Accordingly, we vacate the convictions relating to Count VI and remand for a new trial on that count.[21]

III. Jury Instruction Relating to Authority of District Court to Sentence Cooperating Witness

Because we are remanding for a new trial with respect to certain of the counts charged in the indictment, we briefly comment on one of the challenges raised by Polito and Fortunato to the District Court's jury instructions, as this issue may arise again in the event of a retrial.[22] Specifically, the defendants argue that the District Court erred in instructing the jury that the court had the authority to sentence cooperating witnesses below the statutory mandatory minimum sentence of life imprisonment without a § 5K1.1 letter from the Government.

The District Court instructed the jury that "the final determination as to the sentence to be imposed rests with the Court, whether or not . . . a motion ha[d] been made pursuant to [§] 5K1.1 of the [G]uidelines." Specifically, the charge read, in relevant part:

> [Section 5K1.1] provides that upon a motion by the [G]overnment . . . stating that a defendant has provided substantial assistance in the investigation or prosecution of another person who has been charged with a crime, the court may depart from the [G]uidelines and sentence that person without regard to what the [G]uidelines may require.
>
> There are two factors to be borne in mind in that regard. First, only the [G]overnment can make such a motion. It cannot be compelled to do so; and . . . [s]econd, the court has complete discretion as to whether it will or will not grant

---

[21] Polito's liability on this count was based on Pinkerton.

[22] Given our disposition of these appeals, we decline to address the remaining arguments of Polito and Fortunato, that the District Court erred in instructing the jury with respect to: (a) the "position-related motivation" element of 18 U.S.C. § 1959(a); (b) whether the jury was permitted to draw a negative inference from the fact that Government witnesses had been prepared by the Government's lawyers prior to testifying at trial; and (c) the defense theory that their participation in the Shootings was motivated by personal animosity toward the victims.

that motion, and the court is free, <u>in any event</u>, to impose a sentence within the [G]uidelines as it deems appropriate.

In short, <u>the final determination as to the sentence to be imposed rests with the Court, whether or not . . . a motion has been made pursuant to [§] 5K1.1 of the [G]uidelines</u>.

The clear implication of this instruction was that the District Court had the power to sentence a cooperating witness to less than life imprisonment, even without a § 5K1.1 motion from the Government.[23]

Our case law is clear, however, that even when a witness has, in fact, cooperated with the prosecution, a district court is not authorized to depart below a statutory mandatory minimum sentence unless the Government has moved for a downward departure pursuant to U.S.S.G. § 5K1.1. <u>See, e.g.</u>, <u>United States v. Harrison</u>, 241 F.3d 289, 294 (2d Cir. 2001); <u>see also</u> 18 U.S.C. § 3553(e). The statutory mandatory minimum sentence for murder in this case was life imprisonment (or death). <u>See</u> 18 U.S.C. § 1959(a)(1). Thus, the District Court should not have instructed the jury that it had the authority to depart downward from life imprisonment in the absence of a § 5K1.1 letter from the Government. <u>See United States v. James</u>, 239 F.3d 120, 126–27 (2d Cir. 2000).

* * *

We have considered the parties' remaining arguments and find them to be without merit.

---

[23] The excerpts from the charging conference contained in the appendices make clear that the District Court's jury instruction with respect to this issue arose from its misperception that Bruno, Cerasulo, and D'Urso had been charged with second-degree murder under the generic federal murder statute, which provides that "[w]hoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life." 18 U.S.C. § 1111(b).

-41-

## CONCLUSION

In sum, for the foregoing reasons, we reverse the convictions under Counts I, II, III, V, VII, and VIII in toto, and the convictions under Count IV for obstruction-of-justice conspiracy. We vacate the convictions under Count IV for false-statement conspiracy and the convictions under Count VI in toto. And we remand for a new trial consistent with this opinion.